IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 19, 2025

## SHAQUIL MURPHY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
No. 127661   Steven Wayne Sword, Judge

_____

**No. E2024-01633-CCA-R3-PC**

_____

Petitioner, Shaquil Murphy, was convicted by a Knox County Criminal Court jury of attempted first degree premeditated murder, attempted second degree murder, unlawful possession of a firearm by a convicted felon, two counts of aggravated assault, and two counts of employing a firearm during the commission of a dangerous felony, for which he received a total effective sentence of thirty years' incarceration. Petitioner subsequently filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, Petitioner contends that he was denied the effective assistance of counsel based upon trial counsel's failure to move for a bifurcation of the trial for his charge of unlawful possession of a firearm by a convicted felon and, instead, stipulating to Petitioner's status as a convicted felon. Following a thorough review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and MATTHEW J. WILSON, JJ., joined.

Julia Anna Trant, Knoxville, Tennessee, for the appellant, Shaquil Murphy.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## **Factual and Procedural Background**

Prior to the start of Petitioner's trial, trial counsel addressed the court concerning the charge of unlawful possession of a handgun by a convicted felon in the following exchange:

> [TRIAL COUNSEL]: Judge, the other matter that I think needs to be dealt with . . . by way of pretrial motions, the [c]ourt will notice that Count 1 is a possession of a weapon by a convicted felon.
>
> THE COURT: Yes, sir.
>
> [TRIAL COUNSEL]: -- and recites the prior felonies.
>
> THE COURT: Yes, sir.
>
> [TRIAL COUNSEL]: Now, obviously, Judge, the first listed is failure to appear, we don't particularly have a whole lot of concern about, but the possession with intent to go armed, obviously, would be prejudicial . . . .
>
> [Petitioner] is willing to stipulate that he has the sufficient felonies that the 1307 -- the crime listed in 1307 would apply to him.
>
> THE COURT: So he'd be willing to stipulate that he had a prior conviction that prohibited him from possessing --
>
> . . . .
>
> THE COURT: -- a handgun or a firearm at that date?
>
> [TRIAL COUNSEL]: That's right.  And it's our position that given that offer of stipulation, that the specific nature of the offense is not relevant, because it no longer addresses a fact in issue.  That is, if we stipulate that it is true, it is not in issue and, therefore, is unnecessary . . . to prove.  And so we would suggest that . . . we strike from the [i]ndictment the specific language of the offenses, and simply tell the jury that he has agreed that he does have the necessary felonies, that if he were found to be in possession of a firearm -- handgun or a firearm, it would be an offense under 1307.

After the State agreed to the stipulation, the trial court stated:

> So, General, when you publish Count 1, please just say, did unlawfully possess a handgun, and that [Petitioner] had previously been convicted of a felony that prohibited him from possessing a handgun or a firearm . . . .

On direct appeal,[1] this court summarized the evidence presented at trial, as follows:

### State's Proof

. . . .

Casey Cutshaw, who described herself as a good friend of [Petitioner], testified that early on the morning of August 29, 2019, [Petitioner] was with her in her dark blue Chevrolet Impala when she picked up her friend, Shane Garner, to take Mr. Garner to court. Afterward, Mr. Garner, who rode in the back seat, had her drive him several different places. [Petitioner], who was riding in her front passenger seat, slept during most of that time. However, at some point after Mr. Garner boasted about $100 he had just obtained from a robbery, [Petitioner] told Mr. Garner that he should give some money to Ms. Cutshaw as reimbursement for her gasoline and cigarettes. Although [Petitioner] was not aggressive and his voice was not raised, Mr. Garner "all of a sudden" lunged "over the front seat" with a "Crocodile Dundee" style hunting knife and repeatedly attempted to stab [Petitioner]. Ms. Cutshaw testified that she used her elbow to block Mr. Garner as she pulled her car over. [Petitioner] quickly exited and began walking away, and she and Mr. Garner had an argument in which she scolded him for his actions. In the meantime, [Petitioner] had walked to a corner service station. She and Mr. Garner drove there, and she convinced [Petitioner] to get back in her car.

Ms. Cutshaw testified that Mr. Garner wanted her to drive him several other places, but she instead drove toward the apartment complex she knew as Prince Hall. Mr. Garner suddenly began "screaming" for her to stop the car, so she stopped in the middle of the street and Mr. Garner "jumped out" and walked across the street. After Mr. Garner's exit, she drove [Petitioner] to the home of [Petitioner's] friend so that [Petitioner] could get some

---

[1]To assist in the resolution of this proceeding, we take judicial notice of the record from Petitioner's direct appeal. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987); *State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

marijuana to "calm his nerves." [Petitioner] wanted her to wait for him while he went to get the marijuana, but she did not feel comfortable doing that. She was angry and went "stomping off" down the street, hoping that [Petitioner] would follow in her car to pick her up, but he did not. After sitting on a curb for some time, she saw multiple police vehicles, a fire truck, and an ambulance pass. She then returned to the location she had last seen [Petitioner] and found her car with its trunk and doors open and "covered in yellow tape."

On cross-examination, Ms. Cutshaw testified that after they left court, Mr. Garner asked her to take him to pawn shops, different houses, and to a needle exchange, where Mr. Garner "supposedly robbed three little guys." She stated that Mr. Garner's knife attack against [Petitioner] was unprovoked. On re-direct examination, she testified that there was no further conflict between the men after she convinced [Petitioner] to get back into her car. On re-cross-examination, she testified that, although the men did not argue, the mood between them was very tense.

The parties stipulated that prior to the shooting in the instant case, [Petitioner] had been convicted of a felony offense that prohibited him from possessing a firearm.

Howard Keith Crowe, maintenance supervisor at the apartment complex at the time of the shooting, testified that he was sitting in his pickup truck removing a piece of glass from his finger while his technician was completing a window replacement when he heard a loud crash and looked up to see a white man running out a door. He said the white man slipped and fell as two other individuals came running out the same door and got into a dark-colored car. The white man got up and continued running up the hill, but the dark-colored car pulled around and stopped at the top of the hill, cutting off the white man's path.

Mr. Crowe testified that the white man turned around and ran back down the hill toward Mr. Crowe. Someone got out of the dark-colored car and ran to the corner of a building, and the white man ran up to Mr. Crowe and said, "Help me. He's trying to kill me. He's trying to kill me." At about that time, the man who had run to the corner of the building started shooting at them. Mr. Crowe testified that he initially froze in shock. He said the gunman then ran back to the top of the road, turned, and began shooting at them again.

- 4 -

Mr. Crowe testified that he had a handgun carry permit and kept his handgun in his pickup truck. He said he reached for his gun at the same time that a bullet went through his driver's door. He stated that, had he not moved in that instant, he would have been struck by the bullet "dead center chest." He said he grabbed his gun and ran to the other side of his pickup truck and that bullets followed him as he ran. He then aimed "where [he] could see the bullets coming from and [ ] shot five times." He heard someone say, "I'm hit[,]" and saw the gunman get back into the dark-colored car, which then left the apartment complex. Mr. Crowe identified photographs of the scene, including of the bullet hole in the driver's door of his pickup truck. He said the courtyard behind him was full of small children at the time of the shooting. He stated that neither the white man nor the gunman were residents of the complex and that he had never seen either one before that day. He said the white man did not have a gun.

On cross-examination, Mr. Crowe testified that the white man had a large knife. On redirect examination, he testified that the white man was holding the large knife inside a sheath as he ran up to Mr. Crowe.

. . . .

David Dixon, who described himself as an acquaintance of [Petitioner], testified that on August 29, 2019, [Petitioner], who had a bloody mouth, came to his home, said a white man had "just sucker-punched" him, and asked Mr. Dixon to ride with him to Prince Hall. When they reached the apartment complex, [Petitioner] saw the white man in a breezeway, got out of the car, and ran up to the white man. Mr. Dixon was unable to see what happened, but he assumed that [Petitioner] and the white man fought in the breezeway. He said he saw the white man run out of the breezeway and up the sidewalk, followed by [Petitioner], who ran back to the car and got into the driver's seat. He stated that [Petitioner] drove to the top of the hill and stopped, where [Petitioner] saw the white man again. [Petitioner] got out, and Mr. Dixon assumed he intended to resume the fight. However, Mr. Dixon then heard gunshots and saw [Petitioner] exchange gunfire with someone until [Petitioner] was shot.

Mr. Dixon testified that he remained in the car during the shooting. He said he never saw the maintenance man or anyone other than [Petitioner] with a gun. After the shooting, he saw [Petitioner's] two guns, which he described as an "old kind of gun," and a .38 revolver. He stated that he panicked after [Petitioner] was shot. He knew [Petitioner] needed medical

help, but he did not want to call for help because he had parole violations, so he drove [Petitioner] to his girlfriend's house and had his girlfriend call an ambulance.

On cross-examination, Mr. Dixon testified that [Petitioner] did not tell him that he had a gun. He said he understood that [Petitioner's] intention was to fight the white man, and that he accompanied [Petitioner] to the apartment complex to ensure that it remained a one-on-one fight. He did not see [Petitioner] shooting until he heard the first shot, turned to look, and saw [Petitioner] shooting back. He did not know who fired the first shot.

Shane Garner testified that on the morning of August 29, 2019, his long-time friend, Ms. Cutshaw, who was [Petitioner's] girlfriend, came with [Petitioner] to pick him up for a court date in Blount County. He explained that approximately one month earlier, he and Ms. Cutshaw had been pulled over by the Alcoa Police Department, which had found a methamphetamine pipe in the car. He stated that he was supposed to "take the meth pipe charge and cut [Ms. Cutshaw] loose," but when they got to court, the judge appointed them each a lawyer and set another court date. [Petitioner] was angry about the situation and started an argument with him in the car as they left court. In an attempt to appease [Petitioner], he gave [Petitioner] his last ten dollars so that [Petitioner] could get something to eat from Popeyes.

Mr. Garner testified that the three then stopped at a store for beer and cigarettes. Afterward, [Petitioner] "just flipped out again[,]" bringing up the same argument about what had happened in court. He and [Petitioner] began fighting, and [Petitioner] got out of the car. Ms. Cutshaw started crying and asked him to persuade [Petitioner] to get back into the car, so he got out, walked to [Petitioner], apologized, and convinced [Petitioner] to get back inside.

Mr. Garner testified that he continued to apologize to [Petitioner] after they were back in the car, but [Petitioner] "didn't want to hear it." He said he "didn't like the vibe [he] was getting[,]" and asked Ms. Cutshaw where they were going. She told him she did not know but it would be all right. He then asked [Petitioner] if [Petitioner] was taking him somewhere to kill him. Instead of answering, [Petitioner] just turned and looked at him without saying anything.

Mr. Garner testified that when they came to a four-way stop, he saw a friend and jumped out of the car's window. He told his friend he thought

[Petitioner] was going to retrieve a pistol to kill him, and his friend took him to the home of the friend's mother in "the projects." Mr. Garner testified that the friend's mother was talking to him in a breezeway of the apartment complex when he looked up to see [Petitioner] with a revolver pointed directly at his face. [Petitioner] pulled the trigger twice, but the gun did not fire. [Petitioner] then looked back at a car and held the gun up. At that point, Mr. Garner "took off running[,]" dove into a bush, and pretended to be grabbing for a weapon. [Petitioner] saw him, ran to the car, and got inside. As the car "took off," Mr. Garner saw [Petitioner] and other individuals inside "shuffling back and forth doing something[.]"

Mr. Garner testified that he saw a maintenance man who was wearing a gun at his back, ran up to him, and said, "Thank you, Lord Jesus." At about that time, he heard Ms. Cutshaw yelling from the back seat of the car, "[H]e ain't got no pistol. He's lying." He stated that the car pulled off and came around the side of the building, and that [Petitioner] jumped out and "c[a]me running" toward him while shooting at him. He testified that the maintenance man, who was standing beside him, then pulled out his pistol and shot [Petitioner].

Mr. Garner testified that he had an antique Civil War knife in a "full steel sheath" with him that day, which he had been planning to pawn because he did not have any money. He denied that he pulled it out of its sheath or threatened [Petitioner] with it. On cross-examination, he testified that he was currently in prison for "[a]uto theft" and acknowledged he had a history of substance abuse, which had led him into a life of crime. He said he was certain the maintenance man had his gun in a holster at the small of his back. He was also certain that, at the time of the shooting, Ms. Cutshaw was in the back seat of the car and "some black guy" was in the front passenger seat. He did not think he was carrying the knife when he ran to the maintenance man because he did not recall retrieving it from the bush in which he had hidden it until after the shooting. He acknowledged that he told the police investigator that he had taken the knife off [Petitioner]. He further acknowledged that he asked the investigator for help with his pending Maryville charges.

KPD Investigator Chaz Terry testified that three firearms were collected in the case: a Rohm RG10 .22 revolver, which was found on the ground; a Smith and Wesson .38 Special revolver with six spent casings in the cylinder, which was found on the ground near the .22 caliber revolver; and a Ruger semi-automatic .9mm, which was retrieved from Mr. Crowe.

- 7 -

He identified the DVD of his September 28, 2019 interview with [Petitioner], which was played for the jury and admitted as an exhibit. He also identified a photograph of Mr. Crowe taken at the police station and testified that the object visible on Mr. Crowe's hip was a cell phone in a cell phone holster. He stated that [Petitioner] would not disclose Mr. Dixon's name, but he was able to determine Mr. Dixon's identity by latent fingerprints lifted from Ms. Cutshaw's car.

On cross-examination, Investigator Terry agreed that the knife recovered in the case, labeled as a "bayonet" in the list of trial exhibits, was designed for killing and would be a lethal weapon at close quarters. He acknowledged that the .22 revolver was "an old weapon that [was] in bad shape[,]" that it was not loaded, and that no .22 bullets or .22 shell casings were found at the scene. On redirect examination, he testified that [Petitioner] told him that Mr. Garner held the knife up and verbally threatened him but never said that Mr. Garner attempted to stab him with the knife.

### Defendant's Proof

[Mr.] Dixon, recalled as a witness for [Petitioner], testified that Ms. Cutshaw was not in the car with him and [Petitioner] during the shooting. He acknowledged having told both Investigator Terry and defense counsel that the maintenance man fired first. On cross-examination, he conceded that he did not see who fired the first shot.

. . . .

The twenty-eight-year-old [Petitioner] testified that on August 29, 2019, he and Ms. Cutshaw, a close friend whom he described as his "sugar momma," picked up Mr. Garner to take Mr. Garner to court in Blount County. When they left court, Ms. Cutshaw drove Mr. Garner several different places in Blount County, and [Petitioner] fell asleep in the front passenger seat of the car. When he awakened, Ms. Cutshaw had the car stopped outside a needle exchange in Knox County waiting for Mr. Garner to emerge. Mr. Garner suddenly jumped in the car yelling for Ms. Cutshaw to lock the doors and to go. Almost immediately, another man ran up and attempted to open the front passenger door. After Ms. Cutshaw drove off, Mr. Garner told them that he had just robbed that man.

[Petitioner] testified that when he suggested that Mr. Garner reimburse Ms. Cutshaw for her gasoline and cigarettes, Mr. Garner became "hostile, yelling and carrying on." He said Mr. Garner called him a "n*****[,]" told him he would kill him, pulled out a bayonet, and raised the bayonet "as if he was going to stab [him] with it." [Petitioner] stated that he told Ms. Cutshaw to stop the car to let him out, and Ms. Cutshaw responded that Mr. Garner was not going to do anything. However, Mr. Garner was still being "very aggressive[,]" and [Petitioner] "felt like [Mr. Garner] was actually trying to kill [him]" so he opened his car door to exit. Ms. Cutshaw abruptly braked, and Mr. Garner leaned forward without warning and punched him in the mouth with his right hand.

[Petitioner] testified that he exited the car and began walking away. Ms. Cutshaw convinced him to get back in, but the mood inside was very tense as they drove to the Prince Hall apartment complex. When they arrived, he got out of the car, and Mr. Garner exited behind him and approached in an aggressive manner. Because he believed Mr. Garner intended to fight, he quickly got back in the car and drove approximately a block and a half away to recruit Mr. Dixon to "back [him] up just in case anything [went] down." [Petitioner] explained that he wanted Mr. Dixon present "to make sure that it was fair and nobody jump[ed] in . . . on [Mr. Garner's] side." He stated that he was "frustrated and angry" at Mr. Garner's unprovoked attack and wanted to hurt Mr. Garner "as bad as" Mr. Garner had hurt him. He elaborated that he wanted to either hit Mr. Garner in the mouth "or punch on [Mr. Garner] until he felt satisfied."

[Petitioner] testified that he and Mr. Dixon drove back to the apartment complex, where he retrieved from his aunt's apartment the two guns he had earlier bought from someone at Montgomery Village. He said he bought the guns, despite knowing he was not supposed to have a firearm, because he felt the need for protection due to the area in which he lived, where "innocent people . . . end up getting shot for no reason." He stated that he retrieved the guns in preparation for his fight because he wanted a fair fight. He explained that if Mr. Garner pulled his knife during the fight, he intended to show his gun to "let [Mr. Garner] know to put the knife down and [that they were] going to fight like men."

[Petitioner] testified that he met Mr. Garner as he was exiting the building. He and Mr. Garner argued, and he thought Mr. Garner was about to pull his knife, but Mr. Garner ran. As Mr. Garner ran away, Mr. Garner called out asking [Petitioner] if [Petitioner] thought he was the only one with

a gun and stating that he had "something for [Petitioner's] a** and stuff of that nature." [Petitioner] testified that he got back in the car to leave, but as he pulled out of the driveway, Mr. Garner cut him off, so he got out again. By that time, the maintenance man was reaching into his pickup truck, grabbing his pistol, running to the other side of the pickup truck, and lying across the hood of the pickup truck with his gun pointed at [Petitioner].

[Petitioner] testified that he did not have his gun out at that time. He said he turned to tell Mr. Dixon that the maintenance man had a gun, turned back, heard Mr. Garner yell, "shoot that motherf*****[,]" and the shooting started. He stated that he was shot in the right shoulder and in the back of his right arm and that the bullet that entered his shoulder exited his neck. He testified that he lied to Investigator Terry about not knowing Mr. Dixon because he did not want to get Mr. Dixon in trouble. He repeated that his plan had been to "beat [Mr. Garner] up" and said that he never intended to kill him. When asked what his intentions were when he fired his gun, he responded, "I shot when I heard the gunshots and then when I felt like my life was in danger by [Mr.] Crowe, when the bullets started getting close, 'cause I noticed that he was trying to aim for my head, nowhere else."

On cross-examination, [Petitioner] acknowledged that Mr. Garner never displayed or threatened him with the knife in the apartment complex. He said he had a vague memory from the police interview of saying that he shot at Mr. Garner after Mr. Garner told the maintenance man to shoot him and shot at the maintenance man after the maintenance man fired at him. He stated he was on pain medication and indicated that he was confused during the interview. He acknowledged that Mr. Crowe was not involved in his conflict with Mr. Garner but disagreed with the prosecutor's characterization of Mr. Crowe as an innocent person.

*State v. Murphy*, 676 S.W.3d 91, 94-99 (Tenn. Crim. App. 2023). Following deliberations, the jury convicted Petitioner of attempted first degree premeditated murder, attempted second degree murder, unlawful possession of a firearm by a convicted felon, two counts of aggravated assault, and two counts of employing a firearm during the commission of a dangerous felony. *Id*. at 99. The trial court merged the aggravated assault convictions into the corresponding attempted murder convictions and sentenced Petitioner to an effective sentence of thirty years' incarceration. *Id*. This court affirmed Petitioner's judgments of conviction on direct appeal, and the Tennessee Supreme Court denied further review. *Id*. at 93.

Thereafter, Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, Petitioner filed an amended petition. At an evidentiary hearing on the petition, trial counsel testified that he was first appointed to represent Petitioner in general sessions court in 2020 and continued to represent him through the direct appeal. Trial counsel explained that he had practiced almost exclusively criminal defense since 2006 and that he had tried multiple murder cases before handling Petitioner's case. He said that, during the course of his representation, he met with Petitioner nineteen times, usually at the Knox County Jail. Trial counsel filed a motion for discovery, and he went over the discovery material with Petitioner after it was provided by the State and gave him a copy of the "paper discovery."

Trial counsel testified that Petitioner received a fifteen-year plea offer from the State, which he urged Petitioner to accept. He stated, however, that Petitioner ultimately rejected the offer and was adamant that he wanted to take his case to trial. Trial counsel recalled that he discussed Petitioner's potential sentencing exposure if convicted on all charges. He also talked to Petitioner about the likelihood of success at trial. Counsel explained:

> This was a case where [Petitioner] had made a statement to [police] investigators. And it was a particularly -- it was not a helpful statement."
>
> . . . .
>
> And [Petitioner] said to the [police] investigator, my anger got -- something along the lines of, my anger got the best of me. If I had just gone home instead of going to get the gun, none of this would have happened. And I -- my advice to him was, that's the point at which your trial is over. When the jury hears that statement, they will conclude that this is an attempted first-degree murder, because of how that statement plays into the way the jury instructions form premeditation.

Trial counsel stated that he and a defense investigator went to the crime scene, took photographs, spoke to people at the scene, and interviewed several witnesses, including Mr. Dixon and Mr. Garner. Trial counsel said that he and Petitioner discussed the possibility of Petitioner's testifying and "the pros and cons of that." He recalled that he conducted mock cross-examinations of Petitioner but that "it did not go very well. Primarily, because of the questions relating to . . . the statement he made to the [police] investigator." Trial counsel testified that he advised Petitioner not to testify but that Petitioner decided that he wanted to testify.

Regarding trial strategy, trial counsel explained, "[A]s I saw it, was self-defense, that he . . . had shot at this man in self-defense, because the man had come after him, chasing him with a knife. Right? A knife is an understatement. It was a machete, basically." He said that Petitioner assisted him in developing the trial strategy. Trial counsel stated that, during the trial, he was able to cross-examine several of the State's witnesses about inconsistences between their testimony and their prior statements. Trial counsel acknowledged he did not request that the charge of unlawful possession of a firearm by a convicted felon be bifurcated at trial and that the defense stipulated Petitioner had been previously convicted of a felony offense which prohibited him from possessing a firearm and/or handgun. He agreed that the term "convicted felon" was "inflammatory." He testified, "So if I had it to do over again, I probably, instead of entering the stipulation, would have asked for a bifurcated proceeding. But the goal of the stipulation was to prevent the jury from hearing anymore than just, he's a felon."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. The post-conviction court subsequently issued a written order denying relief. In relevant part, the court found:

> [Although] [n]ot part of his written petition, [post-conviction] counsel presented oral argument during the . . . hearing was that [trial counsel] should not have agreed to stipulate that . . . Petitioner had a prior conviction which prohibited him from possessing a weapon. This issue is waived in that it was not included in his petition.

Waiver notwithstanding, the court found that it was "the normal practice in Knox County Criminal Courts to allow the State to introduce specific convictions when a defendant is charged under [Tennessee Code Annotated section] 39-17-1307 with being a felon in possession of a weapon, as was [Petitioner] in Count 1." The court continued:

> [O]ne of the essential elements of [Tennessee Code Annotated section] 39-17-1307 is that the defendant had a conviction for a prior felony which prohibited him from possessing a firearm. Had he not stipulated, his prior convictions would have been admitted by the court.

The post-conviction court determined that the jury would have heard that Petitioner's prior felony convictions included a conviction for possession of a weapon with the intent to go armed and that "the stipulation avoided this." The court concluded that Petitioner failed to demonstrate that trial counsel's performance was deficient or that he suffered prejudice as to this claim.

This timely appeal follows.

- 12 -

**<u>Analysis</u>**

On appeal, Petitioner asserts that trial counsel rendered ineffective assistance based upon his stipulating to Petitioner's status as a convicted felon rather than moving for a bifurcation of his charge of unlawful possession of a firearm by a convicted felon. He argues that because of counsel's deficient performance, the jury's determination of guilt as to the remaining offenses "was cloaked by the characterization of [Petitioner] as a convicted felon," resulting in prejudice to the defense. The State responds that Petitioner is not entitled to post-conviction relief because he failed to prove that trial counsel was deficient and that any deficiency resulted in prejudice.

***Standard of Review***

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id*.; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

Generally, appellate review is not afforded to issues not addressed by a post-conviction court, and plain error review is not available in post-conviction proceedings. *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020). An appellate court "may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided without objection." *Id*.

***Ineffective Assistance of Counsel***

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the

deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

Although Petitioner failed to include the instant claim in his post-conviction petition, the issue was argued at the post-conviction hearing and ruled upon by the court without objection from the State. Accordingly, we will consider the issue on appeal. *See Holland*, 610 S.W.3d at 458.

Upon review, Petitioner has not established that trial counsel's performance was deficient. Our supreme court has held that, with respect to status offenses like the unlawful possession of a firearm offense at issue here, "specific reference[s] to [a] defendant's prior felonies" are "relevant to establish an essential element of the crime for which the defendant is being tried." *State v. James*, 81 S.W.3d 751, 760-61 (Tenn. 2002). In this

case, there was no dispute that Petitioner had two qualifying prior felony convictions that prohibited him from possessing a firearm. Trial counsel testified that the goal of the stipulation was to prevent the jury from learning that Petitioner had been previously convicted of possession of a weapon with the intent to go armed, and the stipulation accomplished that goal. This court has previously noted that "stipulating to prior felonies and requesting bifurcated proceedings are both valid avenues for a defendant charged with possession of a firearm as a convicted felon." *State v. Johnson*, No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *14 (Tenn. Crim. App. Nov. 14, 2019) (citing *State v. Smith*, No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013)), *perm. app. denied* (Tenn. Apr. 1, 2020). Based upon Petitioner's stipulation, the State did not disclose to the jury the specific nature or the number of Petitioner's prior felony convictions. Although trial counsel testified that, if he "had it to do over again," he "probably, instead of entering the stipulation, would have asked for a bifurcated proceeding[,]" we will not second-guess a reasonable trial strategy or grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson*, 197 S.W.3d at 790. Counsel's decision to choose one of two "valid avenues" of dealing with this issue did not fall below an objective standard of reasonableness under prevailing professional norms. *Goad*, 938 S.W.2d at 369; *see, e.g., Tuttle v. State*, No. M2020-01636-CCA-R3-PC, 2021 WL 6054834, at *5 (Tenn. Crim. App. Dec. 21, 2021), *perm. app. denied* (Tenn. May 18, 2022).

Moreover, Petitioner has not established a reasonable probability that, but for trial counsel's stipulation, the result of the proceedings would have been different. *Goad*, 938 S.W.2d at 370. The post-conviction court found that, if trial counsel had filed a motion for bifurcation (instead of entering the stipulation), the trial court would have denied the motion, and Petitioner has not shown that a bifurcated proceeding was necessary in this case "in order to avoid undue prejudice[.]" *State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). Additionally, the record indicates that the evidence against Petitioner was overwhelmingly strong. The evidence established that, after fighting with Mr. Garner in his truck, Petitioner enlisted Mr. Dixon's assistance and retrieved two firearms he was not legally allowed to possess. Petitioner then drove to Prince Hall where he twice attempted to shoot Mr. Garner in the face. Petitioner then continued to shoot at Mr. Garner as Mr. Garner ran away. When Mr. Garner sought help from Mr. Crowe, a maintenance man at the complex, Petitioner began shooting at Mr. Crowe too, hitting Mr. Crowe's truck. Following his arrest, Petitioner admitted to investigators that his "anger got the best of [him]." He further admitted that if he had "just gone home instead of going to get the gun, none of this would have happened." Petitioner has failed to prove that trial counsel's performance was deficient and that the deficiency prejudiced the defense. Accordingly, he is not entitled to post-conviction relief based upon his claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 687.

**Conclusion**

Based upon the foregoing, we affirm the judgment of the post-conviction court.


s/_Robert L. Holloway, Jr._

ROBERT L. HOLLOWAY, JR., JUDGE